find that the deadly force was unreasonable and the plaintiff submits that that's error because a jury can see what happened. A jury can see the video and can see the teenager literally crawling from the deputy and being shot in the back repeatedly and it's clear from the video that he's unarmed. Given that Michael Thago did participate in the attempted armed robbery which became very violent that he did approach the struggle occurring over the gun. He was wearing a bulky sweatshirt that might have concealed a gun. Why wasn't it a threat like the other three men even as he attempted to flee? Well there's a number of things. First, he was distinguishable by the way he was acting. Secondly, the circumstances had changed. There's really two parts to this entire event. There's the pre-obtaining of the guns by Terrara and Pobjecky and then there's the post-obtaining. Pre-what? Pre-obtaining of the guns. There was the struggle over the guns and then what happened up until then and then what happened afterwards. There's essentially two different... But the whole thing took 35 seconds. Well that's one of the things that's not clear. So there is video but if you look at the video and you play it there's two time stamps actually. One is we see the date and time on the actual video itself until October 1st, 2011 and it gives you the military time. But then when you look at the media player or whatever player you are using to use the video and play it, you can see that it's actually twice as long as the time that's on the time stamp of the video itself. So you know the district court said it's 45 seconds long. Defendant's claim is 35 seconds long. Well it's probably at least that. But getting to your point is while maybe perhaps there's a justification to shoot Michael when he's going towards the struggle. Maybe even when the struggle is going on. But there was two criminal trials in this case. There's dozens of depositions. Literally thousands of pages of documents and not once does anyone ever say that Michael does anything over the struggle over the gun. It's all clear that all he did was stand there. As a matter of fact, in his deposition, Pubjiki himself said that Michael was just standing with his hands by his side. So yes, he was there. He left his post as the lookout and comes into this violent struggle. We're talking about seconds. Yes, he had a different color sweatshirt on. Yes, he didn't engage in the struggle over the gun. But in the space of 35, 45, let's say 60 seconds, how is Mr. Pubjiki to conclude with any confidence that Sago, unlike the other three men, was unarmed, didn't pose a danger? Because he never did anything. He stayed at his lookout post. He never reached for a weapon. He never had any furtive movements. And the record is clear that there was nothing on his person that appeared like a weapon. He never reached for a weapon. He never did anything to appear like he reached for a weapon. What was he doing there? Obviously he was on the lookout. Yes. He was part of the robbery. He was. And if you're talking about shooting him, this court has said before that if deadly force is justified at one point in time, it's not always justified thereafter. And so here we're talking about struggle is over. Pubjiki has one gun. Tarara has the other. Tarara doesn't shoot at anyone, by the way, and you can see it. He's pointing at these people, but he doesn't perceive a danger enough to shoot them. Pubjiki, however, does. But what had changed is the armed robbery was now over. Pubjiki was in charge. He had the gun. He was shooting everybody. And Michael was the last person he shot. And at the point that he shot him, if Michael had presented a threat prior to that, he certainly didn't present a threat at the time that he was crawling away. Now, what was Pubjiki doing in the first place? Sorry? Pubjiki? Pubjiki? Pubjiki? Pubjiki? Is that the way? What was he doing? He was there picking up a pizza. Yeah. And he's an off-duty what? Deputy? Deputy Sheriff. Deputy Sheriff. So he doesn't have a gun. But he fight the, what's the owner of the pizza? Tarara. Tarara is fighting to get the gun away from Coates. One of the real robbers, whatever you want to call your guy. But he's trying to get fighting over that gun. Pretty dangerous thing for him. It was. There's no doubt about it. Yeah, you know, some people say, why don't you just give him the money? Otherwise you're going to get killed. That's pretty dangerous. And then when Pubjiki sees this, he jumps into the fray. He did. And ends up getting the owner's gun off of him. I don't know why that guy didn't reach for his gun, but maybe that's just as well in hindsight. I'm not sure. But then, so he ends up with a gun. And this is where, as you know, as Judge Rovner is pointing out, this time frame here goes in a hurry. It does go in a hurry, but the circumstances clearly change. And one thing that I think is a salient point is that Pubjiki actually turned his back to Michael. And if you look, now the defendants say he turned his back for maybe five to 10 seconds. In reality, it was 10 to 20 seconds. And Pubjiki was specifically trained that if there's a deadly force threat, you never turn your back to him. He should have had his head on the swivel. But Mr. Schwartz, he's got four men there. And he'd already shot three of them by the time that he got to Michael. There's such violent struggling going on. There is, but none of it involved Michael. I mean, basically, by allowing Michael, it's what... I don't know if it would. I'm sorry? I don't know if it would. He's coming into the fray. But that was before the shot. Instead of running away, he's walking right into it. That is, he walked into it, but then he just stood there. And that's what the record establishes, is that, yes, he probably shouldn't have gone in. And yes, when he ran into the fray, I'm not saying he couldn't be shot. During the fray, I'm not saying he couldn't be shot. I'm saying the fray's over. The guns have been obtained by the good guys, for lack of a better term. So how would the good guys know that this guy isn't hiding a gun somewhere, or that the others don't have other guns on them? You're arguing as if this is some slow motion thing. These are decisions that are made in a split second. Of course, it's horrible that the kid died. It's horrible. Well, Tarara was making the same judgments. And he's not trained to look at what is and what isn't dangerous. He's just a layperson like any of us. He looked at the exact same situation. He didn't shoot anyone. But Pobjecki, who's the trained officer, did. And he turned his back to this person. And yes, I think that the strongest point to them not knowing whether a gun was there, another gun is, during this struggle, if Michael had a gun, why wouldn't he pulled it out and shot the other people when they were struggling over these other two guns? Why didn't, when Pobjecki is standing in front of him, shooting at the other people, Michael not pull out the gun and shoot him? I think the fact that none of these things happened show that he didn't have a weapon. He never made a movement for a gun. He never put his hand out as if he's pointing like there's a gun. He never said anything to threaten anybody. And also, this question about fleeing, I think you have to, it's the question is whether he's fleeing arrest. He didn't know that this was a police officer at that point. I think you have to know that there's a police officer involved to be able to actually flee an arrest. That would have helped. Sorry? That would have helped. He said, I'm a police officer. It would have. The problem is he was there to pick up a pizza. He didn't have a gun. And he suddenly injects himself into the fray, which is, you know, he could have sat by too and just ignored everything. I understand. I think the question is, could a jury look at these circumstances and conclude that it was an unreasonable shooting? And I'd like to reserve the rest of the time for my rebuttal. Thanks, sir. Mr. Overs? Good morning. May it please the court. Deceit and three other assailants conspired to commit an armed robbery at Marie's Pizza, forcing Deputy Pacecki, unarmed, simply waiting for a pizza off duty to take action. The district court properly found that Deputy Pacecki's actions were objectively reasonable under the fourth amendment and that he was entitled to qualified immunity. This court should affirm. There is no question, genuine issue of material facts. Do you agree that Michael Sago was not wearing a mask? I believe he was not wearing a mask, like a bandana over his face, as the other three assailants. However, he was wearing a hood over his head, covering his face, in addition to him being the only assailant wearing gloves over his hands. He entered the Marie's Pizza with three masked assailants, all hooded, one carrying a weapon. I think he had a glove on one hand and a mitt on the other. Is that correct? Your Honor, it looked like it appeared that he had a glove on one hand and perhaps a sock on the other hand. But there is no dispute that he did not engage in the struggle over the gun, is there? That's not supported by the record, Your Honor. This record shows, and again, it's based on Scott v. Harris, must take the undisputable video evidence and while plaintiff contends that there's an issue regarding timestamp, that's not of the record, that there's no challenge of the timestamp in the record and on footnote seven of the district court's ruling, plaintiff has waived such an argument. But with regards to whether or not he engaged in the actual struggle, whether he engaged, there is no evidence to show that he, whether or not he engaged in the actual struggle. The evidence does show that he was initially the look, that he conspired to commit an armed robbery. He was initially the lookout and blocking the door. He then chose, after reviewing a struggle over the weapon, chose to enter the fray, rushed to the area of the struggle, which is only, remind you, three, approximately, maybe three foot area, where many, several grown men are struggling over a revolver. He goes directly to that area. Now you see images bouncing up and down. During that time frame, there's a struggle over the revolver and somebody is striking Mr. Wiedner in the back room, the delivery driver in the back room. There is silence on the, with the, in regards to the struggle over the weapon and somebody striking him in the back room. Now, whether or not plaintiff, excuse me, the scene was involved in the struggle, actually physically involved in struggles immaterial. His presence, the view is from an objectively reasonable officer on scene. That's based upon the totality of the circumstances. Here are first also two, your honors. Under Scott versus Harris, plaintiff initiated the encounter and intentionally placed himself and others in danger. He intentionally conspired to commit the armed robbery and he intentionally entered when the struggle ensued. He didn't have to enter. In the film, or the video, it only shows him up to a point that you can't see him. Yes, your honor. Was there any testimony what he did at that time from the officer? No, your honor. Well, from anyone? No, your honor. While the, while counsel states that Deputy Pacecki saw his hands by his sides, that was when he entered, that I believe that's when he entered, not at the time of the struggle. Deputy Pacecki's act, Deputy Pacecki's focus during the time of the struggle was not necessarily on the decedent or any particular assailant. As Deputy Pacecki testified, all he could see was silhouettes whenever, when, during the struggle and after everybody. I'm sorry, you know, there's a little bit of a delay. So do you still take the position that Mr. Sapo came up from behind Mr. Pacecki just before Mr. Pacecki shot him? Because the reply brief takes vigorous issue with you on that. I do, that's not only my position, your honor, but that is the position based upon the undisputed video evidence. The plaintiff argues that Deputy Pacecki couldn't have believed that a decedent was a threat because he turned his back to him. That's assuming that Deputy Pacecki knew decedent was in that area at the time. Certainly a reasonable police officer wouldn't turn a back on a criminal assailant, nor would Deputy Pacecki have done so if he knew where he was. Deputy Pacecki, again, testified he didn't know how many there were or where they were located. That's evident based upon the fact that he turned after he shot, after he turned toward the counter. The decedent, after shots had been fired, instead of surrendering or giving up, he chose to approach Deputy Pacecki from behind. Within this small hallway, only a few feet wide, approached Deputy Pacecki from behind, surprised Deputy Pacecki, he turned, shot three times in rapid succession. That's the only time. Did he approach, come in the door and approach him after a shot had been fired? He approached, the decedent approached Deputy Pacecki from behind after already entering, after there was already a struggle after the weapon and after there had been shots fired. Yes, Your Honor. I want to point out a couple other things. As far as when we're talking about Scott versus Harris, how he initiated the encounter, he chose to commit the armed robbery and plaintiff must, this court must consider plaintiff's culpability in creating the danger. As this court stated in Sherrod versus Barry, there's no guaranteed right one will be free from circumstances where he will be endangered by the misinterpretation of his acts. The plaintiff goes at lengths to state that he was unarmed. That's not reflected by the record and Sherrod versus Barry shows that that's irrelevant. Further, as the court noted, as the district court noted, and as this court has been noting, that he was wearing a baggy sweatshirt, at least one assailant is armed. Deputy Pacecki was trained to believe that if one assailant is armed, then all of them could be armed. And throughout that time, he never gave up. He never surrendered. Deputy Pacecki doesn't know what he's doing, whether he's going to pull, whether he's going to turn to pull a gun or whether he's reaching for a gun. We must also remember at that time after the struggle. Who do you think he should have surrendered to? He didn't even know that Pacecki was a law enforcement officer. I'm not understanding when you say he didn't surrender. I mean, what he should have done is just left. Your Honor, Deputy Pacecki testified that when he was confronted by the assailants initially with the gun pointed at him, he put his hands up in a surrendering type motion so he showed that he was not a threat to anybody. That's what I'm referring to as far as plaintiff. Plaintiff never showed that he wasn't a threat to anybody. But you see, Mr. Futris's argument is that he was trying to surrender. That when he lifted his left arm in the air, he was trying to surrender. I mean, that is his argument. That's plaintiff's argument, but it's not supported by the record, as the district court noted. Further, Your Honor, it shows that the only time that a hand was raised was when he was going for the door, intending to push open the door, not in a surrendering motion. Certainly, if he was intending to surrender, he would have surrendered at the time shots were fired. At some time before before he approached Deputy Pacecki. The record doesn't show, nor reasonable income could be showed, that it was a surrender. Further, not all surrenders, is there a magic on and off switch of that time. Here, Deputy Pacecki already had turned and had already had shot three times in rapid succession by the time that that act happened. Also, too, it's important to note that here, while plaintiff is continuing that he shot an unarmed teenager, we discussed about the unarmed and why, back to where this, back to about the unarmed, he never knew who had the revolver after the struggle. So at any point in time, he believed that any one of those assailants could have the, could have secured the revolver. This is not Tennessee versus Gardner. This is not versus Weindauer. But I'll talk about Ellis, because counsel relies upon that in his brief. In that case, this court noted that after the suspect threw the drugs and the coat after, and then turned and ran away, so he was a distance away, at that time, of course, there was also a factual dispute regarding the facts. There was a factual dispute as whether the acts were reasonable. But this court believed that at the act, at the time of the act, when the drugs were thrown at him and or the coat was thrown at him or whether, when it hit him, that was reasonable. Here, the act, the only at the, the only time Deputy Pacecki actually fired at Deceden was the act of Deceden crawling, coming up right from behind him. And we talk about crawling, scurrying, whatever type of movement you want to describe, the plaintiff, as well as all suspects, were moving on their hands, knees, and feet, and they never stopped moving. From an objective, reasonably, from a reasonable police officer, under totality of circumstances, it was reasonable to believe that they were a threat at all times. I see my time has expired. If there are no questions, may I briefly conclude? Thank you. I just ask that, Your Honor, while we both cited case law, there was not one case that was cited in which the officer was the victim. All the cases cited was where the officers responded to a crime, multiple officers armed, responding to a crime, knowing what was, what was happening. Deputy Pacecki was a victim and, of the victim, and was required to take quick action and split second decisions. Thank you for your time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. There's another issue that Your Honors have to address in the event, despite the clarity of the evidence, that the Court concludes that a fact question exists whether or not the force used was reasonable. That is whether the sheriff had an unconstitutional policy of killing people. Plaintiff's counsel, in order to get around this Court's decision in Calhoun, which addressed the issue of gaps in policy and says there was an express policy and that's why he doesn't have to show other instances of deadly force being used unreasonably. He hasn't expressly said it, but what he's claiming is that the Winnebago County Sheriff had a policy of shooting people in the back. That's what he claims. It's not what the written policy of the Sheriff's Department is. The written policy of the sheriff, as we cite in our memorandum and in the undisputed facts, squared with Tennessee v. Force. What he tries to argue is that based upon testimony of Pubjecky in the criminal trial and based upon testimony of Deputy Ditzler in this case, that those two individuals, the evidence will show, based upon their testimony, that the department had an express policy of using excessive force. That was not Pubjecky's testimony. What Pubjecky's testimony was, and it's quoted by plaintiff's counsel, is that in connection with use of force directed against an aggressive assailant, an aggressive assailant is an individual who doesn't have a weapon, Pubjecky said you can use one level of force above that, which is standard training for police officers. What's one level of force above someone who's not armed and doesn't have any type of a weapon or a club? Plaintiff's counsel hasn't said it what it is, but in standard practice it's using a baton, it's using a taser, it's not using a gun. That's one level above the force when an as plaintiff's counsel would argue that it was the policy of the department to use deadly force without any justification. Ditzler's testimony was simply an opinion on whether or not it was appropriate to use deadly force when the individual entered. Plaintiff's counsel says there was no caveat expressed by Deputy Ditzler. He's wrong. There was. If one looks at pages 99 to 100 of his testimony, he says, if an armed robber enters a store with the intent of helping out other armed robbers, deadly force can certainly be used directed against him. So his opinion was appropriate. Equally important, he didn't give any testimony as to what department policy was. I asked your co-counsel what the time frame was. When did he enter the door with regard to the shot being fired? He entered the door before any shots were fired. He entered the door, joined into the struggle, and the struggle occurred for approximately seven or eight seconds until we first see one of the individuals, other than the deceased, start scurrying out. That's when shots were fired. He had already been involved in the struggle. He had already, and then as he was involved in the struggle, after that, as I said, for about eight or ten second shots were fired. I assume they once he's disarmed, I guess they started to take off. Is that correct or not? I believe what the evidence would show is that Coates was the first one shot. When he was shot, that's when everybody started to take leave. He was shot with the owner's gun. Correct. Yeah. And so the owner, I use that because I don't remember his name. The owner is the the attacker. Correct. The owner ended up getting possession of one of the robber's guns, but Jackie had the owner's gun when he starts firing shots. Where was the owner's gun that Jackie knew where it was? Was on his hip. Okay. And Jackie knew he carried his gun on his hip, reached for the gun, and that's when all hell broke loose, Your Honor. Yeah, okay. Does the video, Mr. Koenig, hi, does the video tell us anything at all about the efforts to reach 9-1-1? Yes. Does the video? No. There's audio, Your Honor, that shows that those efforts occurred after the door was closed and everybody was outside. Ambulance and others. Well, Coats was lying against the floor with a gunshot wound. The other three had already exited when I believe 9-1-1 was successfully called, Your Honor. Okay. But what you're saying is that the tape allows us, allows you to hear. I guess it was the cook who was trying to reach 9-1-1. Also, two of them were trying to reach 9-1-1. The initial call was placed by the pizza maker, I believe. Right. And it took seven minutes to get 9-1-1. For 9-1-1 to, I believe for 9-1-1 to arrive, Your Honor, for an ambulance to arrive was between seven and 11 minutes is my recollection. I think Judge Roedner's question was how soon did, after 9-1-1 was dialed, did 9-1-1 respond? I believe, Your Honor, as I said, I believe an ambulance arrived approximately seven minutes later. So when they called, they got 9-1-1 and the ambulance came. That's my understanding, Your Honor. My understanding was that it took seven minutes to reach 9-1-1 and the ambulance came in four minutes because the hospital's across the street. It was, Your Honor, and I must confess that your recollection is, I believe, better than mine. I was focused on the policy claim of the department. Right. It probably was a better question addressed to your friend. If I may, Your Honor, under Rule 801 D2D, not everything that an agent says involves a matter within the scope of his employment. Without regard to what the officers may have said, they were not final policymakers, neither of the deputies, nor did they have any meaningful input into the policymaking process. I would point out that this claim of express policy was not contained in the complaint, was not contained in his answers to interrogatories, nor was there any evidence identified in his answers to interrogatories. So it's inappropriate to bring it up at this point in time. And his policy argument was brought up for the first time in his reply, which is against the law in all circuits. Thank you, Your Honor. Thank you, Counsel. How much time? I'll give you another minute. You got five minutes. I have five minutes. Yeah. Well, I gave you another minute. Oh, thank you, Judge. I'll start off where I ended, which is before I get to the policy claim. But I think what's clear in hearing Mr. Overt's account is there's significant dispute over the facts in this case. For instance, you know, he said that, well, the first shots rang out before Michael started running towards the fray. We disagree. Mr. Koenig just indicated that, yes, that's not what happened. With respect to what Pobjecki said about what Michael was doing when he was off camera, Mr. Overt says, well, that was when he first came into the store. I pointed out in the portion of the deposition where Pobjecki, I specifically asked him, what was Michael doing off camera? And he said his hands was by his side. So Pobjecki knew what Michael was doing. That's a factual dispute. That goes to what Pobjecki knew and how he would react given those circumstances. The video, and this is clear, is he wouldn't back down from this. What was Michael doing when he was shot? Was he still approaching or was he crawling away? The defendant still won't even acknowledge that it's on the video. I highlighted, I circled the shell casings. You can see that he was crawling away when he was shot. And they're still saying, no, he was approaching the deputy. He wasn't. And this question about, well, he never knew who had the revolver. Sure he did. It's on the video. He looks right at Tarara when Tarara's pointing the revolver at Brandon Sago and Bellman. And that's before he shot Michael. He knew who had the revolver. He knew that Tarara wasn't firing. Well, there's no way he knew how many revolvers were there unless they were displayed. And none others were displayed. There was never another weapon pointed in his direction. If there was, certainly. That one isn't coming. That doesn't mean that in a second or two, one comes out from under a sweatshirt. Well, I think that you're saying that he could shoot Michael because of what might happen. You're talking in pure hypotheticals. And I think there's an armed robbery. Sure. And you've got four guys coming in this store and shots being fired. What would you do? I'm not a police officer. I'm not trained in this. And maybe I would've done the same thing Tarara did. Shoot no one. And in an armed robbery, common sense tells you if an armed robber's got a gun, he's not going to hold it while someone's shooting at him. He's not going to hold it while his friends are fighting over two other guns. Common sense will tell you he's going to pull it out and shoot the guy in the face. He didn't. When another gun never materialized, I think a reasonable inference that a jury can do is there were no other guns, particularly by Michael, because he wasn't doing anything. He was standing there. And by the time he was shot, circumstances had changed. You seem to not be willing to admit that he had been standing there. He had. When the struggle goes on, he's coming into it. Correct. That's the problem. But by the time he was... That's not when he was shot. He was shot later. The struggle was over. Like maybe three seconds, four seconds, five seconds. Maybe 20 seconds. After Pobjecki turns his back to him. And that's a salient point I think I have to stress is if there's a police officer that believes... This is something he testified and this is something that the deputy chief testified to is that they are trained, police officers are trained that if there's a deadly force, that you believe there's a deadly force assailant, you never take your eyes out that person. And he did. And a reasonable inference... But where to put his eyes? There are four of them. Would you know where to put your... Well, we shouldn't bring you into it. He didn't know where to put his eyes. Who knows where his eyes were going? Well, the defendants... If only he had eyes in the back of his head. Well... He'd be here today. Well, all he had to do was turn his head to see. And the fact that he didn't tells me that he didn't believe that he was a deadly force assailant at that time. Was there a policy to assume that one is armed or all armed? I'm sorry? If one was armed, they were all armed? I don't think that's a reasonable assumption. I think if they're all armed, they all pull out their weapons. Well... I mean, I don't think... It wasn't the case here, but it could be the case. Is that an assumption that the officers permitted to make? I think he could initially. But when it never happened, I think at that point the circumstances had changed. Well, as Judge Rovner was pointing out, the guy just came in. Who knows when he might pull it out? But he never did. And he never did anything to indicate that he was going to. My point is circumstances had changed at the time that he was shot. He was no longer involved in a struggle. He was no longer making a furtive movement. He was crawling. And it's not reasonable. If he had made a furtive movement, he was crawling away. If he had said, I'm going to get you. If he had said something. If he had done something other than at the time he was crawling away, yes, maybe perhaps then it's unreasonable to say he shouldn't have shot him. But at that time, it's 20 seconds, 30 seconds after the struggle is over. Everyone else is shot. Everyone else is gone. He's crawling. At that point is when I'm saying it's no longer reasonable. If he had done something that... I'm not saying don't point the gun at him. Just in case he pulls out a gun. I'm saying don't shoot him. So unless there's any further questions, I didn't get a chance to address the Monell claim. But for the reasons I stated in my brief, so I would ask that the summary judgment be reversed. Thank you, Counsel. Thanks to all counsel. And the case is taken under advisement.